FILED IN CHAMBERS
U.S.D.C. – Rome

JUN 19 2019

(USAO GAN 6/10)  Search Warrant

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

JAMES N. HATTEN, Clerk
By: _____

In the Matter of the Search of

Twenty-Six Digital Devices Listed in Attachment A

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**

Case number: 4:19-MC-35-WEJ

I, James Rives, being duly sworn depose and say:

I am a Special Agent of the Bureau of Immigration & Customs Enforcement (ICE) and have reason to believe that in the property described as:

Twenty-Six Digital Devices Listed in Attachment A

in the Northern District of Georgia there is now concealed certain information and certain data, namely,

See Attachment B,

which constitutes evidence of a crime and contraband, fruits of crime, or items illegally possessed, concerning violations of Title 8, United States Code, Section(s) 1324(a)(1)(A) & (B)(1); Title 18, United States Code, Section(s) 922(g)(5); Title 18, United States Code, Section(s) 1956(a)(1); and Title 18, United States Code, Section(s) 1957(a). The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to before me, and subscribed in my presence

_____
Signature of Affiant

James Rives

June 18, 2019
Date

Rome , Georgia
City and States

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

AUSA William Traynor

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, James Rives, being duly sworn, depose and state:

1. I am a Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement. I have been a Special Agent since April 2, 2007. Before I joined ICE, I was a police officer with the Alpharetta Police Department for about seven years. I completed the Special Agent Training Course at the Federal Law Enforcement Training Center in September 2007, where I received training in immigration law, nationality law, and criminal law. I have continued to receive training in legal and investigative matters. I work in the ICE office in Dalton, which is in the Northern District of Georgia. I investigate, among other things, violation of federal immigration and firearms laws.

2. I make this affidavit in support of an application for a search warrant for cell phones, computers, electronic devices and electronic storage medium (hereinafter "the devices"), described in Attachment A, that were seized on April 30, 2019, in locations in the Northern District of Georgia, under the authority of search warrants issued by this Court in the investigation of Juan Perez and Aztec Framing. Agents were careful to seize only devices that Perez used, such as the cell phone he used on the morning of his arrest to send the text message "The fucking police are here. Get ready." Agents did not seize devices used primarily by Perez' children. Since they were seized, the devices have remained in the secure custody of the U.S. Department of Homeland Security in Dalton, Georgia. I seek this warrant so that the devices so may be searched for evidence, fruits, and instrumentalities of criminal violations relating to alien harboring, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii)

and (iv) & (B)(1); being an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5); and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1) and 1957(a).

3. This affidavit is based on my observations, training, and experience, and information obtained from other law enforcement investigators and witnesses. This affidavit is also based on the review of bank records, and records received from state law enforcement, tax, and vehicle registration agencies.

4. This affidavit is also based on statements Perez made in a post-arrest interview on April 30, 2019, and on sworn testimony he gave in a deposition in the civil case of *Leroy Williams v. Rosendo Ramirez-Guzman and Aztec Builders Inc., d/b/a Aztec Framing*, Case No. 14C444 (Hamilton County Circuit Court, Hamilton County, Tennessee) on August 7, 2015. This affidavit is also based on information obtained from Aztec Framing's website, http://aztecframing.net./.

5. This affidavit is intended to show that there is probable cause to believe that Perez's devices now contain evidence of the violation of federal immigration, money laundering, and firearms laws. I intend to establish probable cause in this affidavit, and not to set out all of the information that has been developed in this investigation.

### *Background of Investigation*

6. Juan Antonio Perez and his wife, Eva Torres, are natives and citizens of Mexico who have been in the United States illegally for many years. During this time, Perez has built a successful and lucrative residential construction business, Aztec Builders d/b/a Aztec Framing. This investigation has learned that one reason for Aztec's profitability is that Perez and his subcontractors employ illegal aliens for

whom no payroll taxes are withheld and who receive no insurance or other benefits. Perez has built a compound-like home in a remote corner of Bartow County, Georgia. He owns several other properties and has amassed a collection of expensive vehicles. Because Perez is not an American citizen, he requires the help of citizens to register his vehicles in their names, register electrical and other utilities in their names, and obtain firearms for him.

*Properties*

7.   Perez, his wife Torres, and their children live in a compound-like house Perez built in 2007 at 404 Folsom Glade Road in rural Rydal, Georgia. Perez built the house in a remote site, with access so limited that it can be surveilled surreptitiously only by helicopter. The house is surrounded by a tall wall and gate, and utility and other workers who have had access to the grounds report that armed guards patrol inside the wall. According to information from the Bartow County Board of Assessors, the house has 7,543 square feet of finished space on two floors, with 5.5 bathrooms. As of January 10, 2014, the county valued the house at $680,900. The property includes two multi-car garages where Perez stores some of his many vehicles. As developed below, Perez's friends report that he collects firearms and keeps some in a safe in his home.

8.   Aztec Framing has three business offices at these addresses:

    1)     1325 Cassville Road, Cartersville, Georgia;

    2)     1641 LaFayette Road, Rossville, Georgia; and

    3)     1027 Lower Mill Road, Hixon, Tennessee.

9.  Perez also owns a house at 375 Boulder Road, in Kingston, Georgia. He calls this his "fun house" or "toy house," where he stores vehicles and other expensive "toys," and spends weekends.

10. Perez also owns a house at 4262 Apache Drive in Acworth, Georgia. Perez harbors illegal aliens in this house, in that he rents it to illegal aliens who work for Aztec Framing. Both Perez and Torres have listed this address as their home address on Georgia driver's licenses.[1]

### *Bank Accounts*

11. As Perez testified in a deposition, and as the investigation has learned from other sources, he is the primary employee of Aztec Framing, meaning that he finds the jobs, writes the checks, keeps the books, and hires the subcontractors and laborers for the company's construction jobs. Perez testified that over the years he has had about a half-dozen employees. He paid on a daily rate, or by-the-job, as they worked for him. Even for the people he deemed his "employees," Perez did not withhold payroll taxes, Social Security taxes, or keep any records other than check stubs. As for the laborers, Perez either pays them directly with weekly checks, or he pays subcontractors by-the-job, who then pay their laborers. Perez testified that he keeps his payment and business records in his business offices in Georgia, his office in Tennessee, and his laptop computer.

12. By paying illegal aliens at below-market rates, not providing them any benefits to them or any other employees, and not withholding and paying over payroll taxes, Perez has made substantial amounts of money. Two of Aztec

---

[1] It is not clear how Perez and Torres obtained Georgia driver's licenses, as neither have lawful immigration status in the United States.

Framing's business accounts are at PNC Bank (account numbers 3611 and 6393). Perez is the signee on the accounts. Between June 11, 2018, and October 1, 2018, 320 checks, ranging from $2,500 to $59,272, totaling $2,367,909 were issued through account 3611. These checks do not follow any apparent weekly or biweekly pattern. A large number of the checks were for round dollar amounts, and multiple checks were paid to the same payee on the same day or consecutive days. Account 6393 was funded during this period primarily by wire transfers from account 3611, including a transfer of $850,000 on August 2, 2018.

13. Aztec Framing has several other accounts at PNC Bank. As of December 31, 2018, its business saving account had a balance of than $741.009.96. In addition, Aztec Builders business saving accounts had a balance of $287,923.69 and $58,388.74 on the same date.

### *Vehicles*

14. Perez has used his wealth to indulge his taste for expensive vehicles, ranging from expensive, limited-edition Ford Raptor pickup trucks to classic muscle cars to contemporary sports cars, including Porsches and a Nissan GTR. The investigation has found that Perez owns dozens of such vehicles, all of which are registered in other peoples' names including, as developed below, Jorge or Vanessa Cabanas, or Jeff Espinoza. Few if any of these vehicles would be of any practical use for a construction business. Perez stores many of these vehicles in the three- and four-car garages that he has added to most of his properties, including two to his home. Several of these garages are equipped with lifts that double their holding capacity by making it possible to store two vehicles in each bay.

5

### *Helpers*

15. Perez has several people who help him by doing things for him in their names. Two of his helpers are Jorge and Vanessa Cabanas. Jorge Cabanas is a citizen of Mexico and legal permanent resident in the United States and Vanessa Cabanas is a United States citizen. They operate Tarasco's restaurant in a building that Perez owns at 1325 Cassville Road in Cartersville. One of Perez's offices is behind the restaurant and uses the same street address. In April 2013, investigators learned that Tarasco's was writing weekly checks for men who worked for Perez/Aztec. The payroll checks totaled several thousand dollars every week.

16. In an interview in March 2014, Jorge and Vanessa Cabanas explained that they are close friends with Perez. They said they have used their names to purchase and register vehicles for Perez because he has no immigration status in the United States and, therefore, cannot register vehicles in Georgia in his name. The Chevrolet vehicles they have purchased and registered for Perez include Corvette and Camaro sports cars, a Tahoe SUV, and a Silverado pickup truck. (Investigators have seen Perez driving these vehicles, but never the Cabanases.) Jorge Cabanas also registered a Ford Raptor pickup truck that Perez regularly drove for years.

17. Jorge Cabanas said he had also purchased a firearm for Perez. In this and later conversations, Cabanas said that Perez made it clear in several conversations that he was interested in firearms and he collected them. Cabanas said he had not seen Perez' firearms collection, but he had seen large gun safes in Perez's home at 404 Folsom Glade Road in Rydal.

18. Vanessa Cabanas—whose suspicious banking practices have led at least two banks to suspend and close her accounts—said that Perez has been so successful

6

financially because Aztec Framing uses illegal aliens who are paid below-market wages. She said Perez also overstates their wages on his IRS tax forms to reduce his business income taxes. She estimated that Perez had about 200 employees, all or nearly all of whom were illegal aliens. Jorge and Vanessa Cabanas volunteered to cooperate with law enforcement agents in investigating Perez, but it was later learned that they warned Perez of the investigation, forcing investigators to suspend the compromised investigation.

19. Jorge and Vanessa Cabanas said they knew it was against the law for them to purchase and register vehicles for Perez, but they did so because of their friendship. Jorge Cabanas said that he had owned a house at 85 Kingston Hwy 293 in Cartersville, but he had sold it to Perez to pay the debt he had generated running Tarasco's. As of late September 2018, the Cabanases operated two restaurants in Cartersville, Tarasco's and Tacos and Wings. The Bartow County Tax Assessors list Aztec Framing as the owner of Tarasco's property. According to the Georgia Corporation search, Vanessa Anne Cabanas is the CFO, CEO and Secretary of Tacos and Wings.

20. As of late April 2019, the Cabanases still operated a partnership with Perez and were frequency seen together at Tarasco's.

21. Jeff Espinoza is another of Perez's helpers. He is a native of Mexico who naturalized as a United States citizen on June 14, 1996. Espinoza first came to agents' attention in November 2014, when they saw Perez's wife, Eva Torres, driving a Mini Cooper that was registered to Espinoza, who registered it using the home address of the 85 Kingston Hwy 293 house that Cabanas sold to Perez. Agents later learned that Espinoza was the nominal account holder for the utilities

for some of Perez's other properties, including a house at 375 Boulder Road in Kingston, Georgia, that Perez bought from Ashley Black.

22. On January 17, 2015, a Bartow County Sheriff's Deputy stopped Perez for speeding. Perez identified himself with an expired Georgia driver's license that listed his home address as 4262 Apache Drive in Acworth—which is the house that Perez provides to some of illegal aliens who work for him. The deputy arrested Perez for driving with a suspended license. At the jail, he listed his home address as 404 Folsom Glade road in Rydal. Espinoza came to the Bartow County Jail and paid Perez's bond.

23. *Perez's testimony about Espinoza*: Perez testified in his August 2015 deposition that Espinoza as one of the five or six people he considered to be employees of Aztec Framing. Perez testified that Espinoza was a superintendent who inspected work by Aztec's crews or subcontractors. Perez testified he paid Espinoza $200 for each day he worked. Perez testified that he did not withhold employment taxes or Social Security payments from Espinoza's payments. Perez testified that Aztec did not provide Espinoza a vehicle.

24. A Form I-9 is the federal Employment Eligibility Verification form. Federal law requires employers to verify the identity and legal authorization to work of all paid employees. Federal law requires employers to ensure the proper completion of a Form I-9 for every individual they hire for employment in the United States. In his deposition, Perez testified that he did not know what a Form I-9 is. Not surprisingly, Perez testified that he did not require Espinoza or any other Aztec employee to complete a Form I-9.

25. *Espinoza's statements*: In an interview in November 2015, Espinoza told agents that he had worked at Aztec Framing for about four years. He said he did administrative duties, such as payroll and paying invoices. He said he obtained utilities for properties in his name because Perez could not obtain them because he was an illegal alien.

26. Agents met with Espinoza again in September 2017. He said that he recently stopped working for Perez. He acknowledged that while he owns two vehicles, there are more than fifteen registered under his name in Georgia, including Torres' Mini Cooper and a Dodge Ram pickup truck that Perez drives. Espinoza explained that Torres is his cousin, and he registers vehicles and other things for Torres and Perez because neither has any valid identification documents. He said that when he worked for Perez, he often did personal tasks for Perez instead of supervising Aztec Framing jobs. Those tasks included registering vehicles, utility accounts, and properties for Perez.

27. Espinoza also said that Perez collects firearms and has a large firearm safe in his house at 404 Folsom Glade Road in Rydal and his "fun" house located at 375 Boulder Road in Kingston.

28. Agents met Espinoza again about six weeks later, in October 2017. Espinoza said that Perez has a small number of "team leaders" he pays lump sums per job. The team leaders then hire laborers for Aztec Framing jobs. Most of the laborers are illegal aliens, Espinoza said. This is a highly profitable business for Perez, Espinoza said, because the laborers' share of the lump sums paid to team leaders is less than the minimum wage, and they do not receive any sick or vacation time or any other work-related benefits.

29. Espinoza said that Perez keeps Aztec Framing's business records—check books, tax records, contracts, etc.—at four locations:

    1) Perez's house at 404 Folsom Glade Road, Rydal;

    2) the Aztec business office at 1325 Cassville Road, Cartersville;

    3) the Aztec business office at 1641 Lafayette Hwy in Rossville; and

    4) the house at 375 Boulder Road in Kingston.

30. In addition to Jorge and Vanessa Cabanas and Jeff Espinoza, agents have identified Ashley Black as something of a "helper" to Perez. In November 5, 2015, Black sold Perez his house at 375 Boulder Road in Kingston and all its contents and unknown amount cars. The house is a large single-story range style house with at least three bedrooms and a front porch that runs almost the entire length of the front of the house. The driveway leading to the house is gated making roadside surveillance impossible; however aerial surveillance revealed a pool with another structure directly behind the main house. The structure appears to be a covered entertainment area, possibly a kitchen, with a small dwelling attached. This dwelling appears to be a guest house or an addition living area to the main house. There is also a separate three car garage that is not attached to the main house that is located across the driveway from the main house and the pool. It was also noted that two large barns sit on the property that are big enough to store multiple vehicles. Vehicle tracks could be seen going to the barns from the aerial surveillance.

31. Due to the untraditional matter that Perez negotiated the sale of the house, it is impossible to determine what exactly was the sale price. Black and Perez negotiated the price, and then Perez paid him with several checks, each written in amounts between $30,000 and $50,000. In the memo line on the checks, Perez

wrote "375 Boulder Road." In an interview on August 13, 2018, Black said that Perez calls the house on Boulder Road his "fun" house, meaning that he spends his weekends there. Black said Perez stores some of his vehicles at the house.

32. Black described himself as a "trader." As an example, he said that he once bought a Porsche sports car from Perez for $90,000. About three days later, Perez said he could not find another Porsche like that one, and he wanted to buy it back. Black sold it back to him for $70,000, taking a loss of $20,000. Black said he trades with Perez and he would make up the loss in another trade by buying an asset from Perez below its market value. When I told Black that his "trading" with Perez appeared to be a form of money laundering, he simple stated that he was a "trader."

33. Black said he knew that Perez conducted Aztec Framing's business and stored vehicles in his office behind Tarasco's restaurant at 1325 Cassville Road in Cartersville. Black said he knew that Perez also worked from the Aztec offices at 1641 Lafayette Hwy in Rossville and 1027 Lower Mill Road in Hixon, Tennessee. Black said that Perez occasionally works from his home at 404 Folsom Glade Road in Rydal.

34. Black said that Perez was interested in firearms, and he had sold a rifle to Perez after Perez had expressed an interest in it.

### *Employees*

35. In the past few years, agents and law enforcement officers have had contact with several of Perez's employees under a variety of circumstances. In every case, the employee has been in the United States illegally. On June 9, 2014, a Bartow County sheriff's deputy stopped Juan Carlos Taboada-Chavez for a traffic violation. Taboada was driving a Chevrolet Silverado pickup truck that was registered to

Espinoza. He was stopped soon after he left the house at 85 Kingston Hwy in Cartersville that Perez bought from Cabanas. The deputy arrested Taboada for driving without a driver's license. Taboada admitted to being in the United States illegally. He said he was an employee of Aztec Framing. He said he had worked for Perez for more than a year, and he was paid a lump sum every week. He said his job was to deliver construction materials to Aztec Framing project sites, and most of the sites he visited were in Tennessee. Taboada said Perez knew he was in the United States illegally.

36. On September 22, 2015, a Bartow County sheriff's deputy stopped Ramon Hernandez-Ramirez for a traffic violation. Hernandez was driving a white van with the word "Roofing" on the side. Hernandez gave the deputy a Georgia driver's license that had expired several years earlier. When the deputy asked about the license, Hernandez said he was in the United States illegally and could not get another license. Hernandez lived in the house at 4262 Apache Drive in Acworth that Perez owns and provides to some of his laborers. (As noted above, when Perez was stopped for speeding on January 17, 2015, he presented a Georgia driver's license that listed 4262 Apache Drive in Acworth as his home address.) Hernandez said he paid Perez monthly rent of $900 to live in the Apache Drive house with his wife and two children.

37. When I interviewed Hernandez later that day, he told me that he was a self-employed roofer who worked exclusively for Perez on Aztec Framing jobs. He said that Perez paid him weekly by check. Aztec bank records show that between December 21, 2013 and November 22, 2014, Aztec paid him a total of $72,246.73. The Aztec payroll checks listed the business address as 404 Folsom Glade Road in

Rydal—Perez's home.

38. More recently, on March 12, 2018, agents interviewed Juan Carlos Landaverde-Compean at his home in Cartersville. We wanted to speak with him after a review of Aztec Builders' bank accounts showed that Perez wrote checks to Landaverde that totaled about $250,000 in 2017. Landaverde said that he was a house framer for Aztec Builders, and he worked for Perez. He said he was in the United States illegally, and Perez knew that. He said he usually worked 7:00 a.m.-8:30 p.m., Monday-Saturday. He said he is a "crew boss" for Perez, meaning that it is his responsibility to pick up five workers and bring them to Aztec work sites. Landaverde said he also recruited laborers for Perez, and they were usually in the United States illegally. He said there were no eligibility requirements to work for Perez, and he did not provide any benefits other than weekly pay—no overtime pay, no vacation or sick leave, and no insurance. He said Perez has several crew bosses.

39. There was a white cargo van with a Tennessee license plate in Landaverde's driveway. It was registered to Aztec Builders, 1027 Lower Mill Road in Hixon, Tennessee. Landaverde said he did not work for anyone other than Perez, because Perez always had enough work for him.

40. *In his deposition in August 2015, Perez testified* that Landaverde was, like Jeff Espinoza, one of the few people he considered to be an employee of Aztec Builders. He described Landaverede as a framer and said that he had worked for Aztec Builders "off and on" for the preceding ten years. Perez testified that he paid Landaverde $160 per day regardless of the number of hours he worked. Perez said that like Espinoza and his other employees, Landaverde did not fill out an application or an I-9 form, and Aztec did not withhold any taxes or Social Security

from his paychecks. Perez testified that Landaverde's and his other employees'
employment files and check stubs would be stored in the Aztec office on Lower
Mill Road in Hixon, or the Aztec office at 1641 Lafayette Road in Rossville.

### Aztec Builders Today

41. As of late April 2019, Aztec Builders is still a very active and profitable
company doing a large amount of business in North Georgia and Tennessee. The
company advertises their business locations at 1641 Lafayette Road in Rossville,
1325 Cassville Road in Cartersville and 1027 Lower Mill Road in Hixon,
Tennessee. Aztec Framing Contractors also list 4262 Apache Drive, Acworth, GA as
a business address during an internet search. The website lists Juan Perez as the
business owner and states, "Aztec Framing Contractors is the only company located
at 4262 Apache Drive, Acworth, GA." During the investigation, agents encountered
and determined that employees of Aztec Framing live at the residence in Acworth
and pay rent to Juan Perez who owns the house.

### Arrest and Interview of Perez

42. On April 24, 2019, this Court issued a complaint authorizing Perez's arrest
on charges of harboring illegal aliens for commercial advantage, money laundering,
and being an illegal alien in possession of a firearm. *United States v. Juan Antonio
Perez*, 4:19-MJ-11-WEJ. Agents arrested Perez at his home in Rydal the morning of
April 30. I identified myself to Perez and explained that the Court had issued
warrants for his arrest and the searching of his home for evidence. I read Perez his
*Miranda* warnings. He said he understood the warnings and that he wanted to talk
to agents without an attorney present. He then memorialized this decision by
reviewing and signing a DHS *Miranda* waiver form. I spoke with Perez in English

throughout the morning and he appeared to have no problem understanding me. He answered my questions in English, and all of his responses were appropriate and directly addressed my questions.

43. Perez said he was the owner and operator of AZTEC FRAMING, which he started in 2005. Perez said he entered the United States with his cousin, without permission or inspection, when he was about 15 (he is 46 now). He said he worked a few jobs, such as cleaning floors for Kmart, until he learned house framing. That prompted Perez to learn the construction business. He said he began running a construction work crew when he was about 16 and living in the Buford Highway area of metro Atlanta. Perez said he eventually started AZTEC FRAMING and moved to the house at 4262 Apache Road in Acworth.

44. Perez freely admitted that he hired workers who were in the United States illegally, in that they had no immigration status in this country. He said that in the construction business, "it is impossible not to have illegals," and "you will never find a harder worker than an illegal Mexican". Perez said that as he built his personal wealth, he brought the property in Rydal, and then used one of his construction crews to build his house. Perez said that after he moved his family out of the house in Acworth, he rented it to Ramon Ramirez, who he knew was in the United States illegally. Perez said that he would have Jorge and Vanessa Cabanas and others register cars for him in their names to "stay under the radar," due to him being illegally in the United States.

45. Perez said that he now rents the Acworth house for $1,000 per month, and the Hixon house for $1,200 a month. Perez said his tenants in both houses work for him, and he knows they are in the United States illegally.

46. Agents found 14 firearms throughout Perez's home—eight pistols and six long guns. A preliminary records check showed that Jorge Cabanas was the original purchaser of the Ruger LCP .380 pistol that agents found in Perez's home. When asked about the firearms, Perez said that he knew he was not allowed to have a firearm because he is in the United States without permission.

47. Perez confirmed that he bought the house and property at 375 Boulder Road in Kingston from Ashley Black. Perez said he used the house as a weekend "fun" house where he stores ATVs and other recreational equipment.

48. Perez said he owned the house at 85 Kingston Hwy 293 in Cartersville that Jorge Cabanas had sold to him to pay a debt. Perez said he allows Gasper Contreras to live there rent free. Agents met Contreras when they arrived at Perez's house the morning of April 30. Contreras is a native and citizen of Mexico who entered the United States without permission or inspection. Perez said that Contreras is a long-time friend who works as Perez's driver. Perez said that Contreras drives for him so that he can conduct business on his Apple iPhone (which is one of the devices listed in Attachment A). Perez said he conducts a lot of business by text messages. Perez said he knew that Contreras was in the United States illegally and did not have a driver's license.

49. While I interviewed Perez, he kept receiving text messages and phone calls on his iPhone. Perez explained that these text messages and calls were workers who were contacting him to find out where they would we working that day. He said he kept contact information for many of his workers in his phone. At one point in the interview Perez received a text message and promptly typed the response, "The fucking police are here. Get ready." Perez sent the text and closed his text

messaging app before I could get any more information about the text message.

50. As the interview was concluding, Perez again said that he pays just for his labor costs, and he knows that most of his workers are in the United States illegally. Perez said he assigns "crew chiefs" to gather the necessary workers to complete a project. He gives the crew chiefs checks to pay the workers. Perez said he worked through crew chiefs to try to limit his liability for using illegal aliens as his work force. Perez said that he lets many of his workers drive Aztec Framing's vehicles despite knowing that they are in the United States illegally and do not possess driver's licenses. Perez said, "that is a risk we have to take". Perez said that by using illegal aliens as workers, he was able to get work because his reduced labor costs let him undercut other construction companies' bids.

51. Perez said that he does not keep tax or other records for many employees, but the records he possesses are on his computers or listed in documents in his Cartersville and Rossville offices.

### *Search Warrants*

52. On April 24, 2019, this Court issued search warrants for five locations in Georgia:

      1)       Perez's residence at 404 Folsom Glade Road in Rydal;

      2)       The Aztec Framing business location at 1641 Lafayette Road in Rossville;

      3)       The Aztec Framing office at 1325 Cassville Road in Cartersville;

      4)       Perez's weekend residence of 375 Boulder Road in Kingston; and

      5)       Perez's house at 4262 Apache Drive in Acworth.

53. Agents executed the warrants and arrested Perez at his home on April 30, 2019. Agents seized the devices listed in Attachment A during the execution of the search warrants at Perez's residence in Rydal and the Aztec Framing offices in Cartersville and Rossville. Agents did their due diligence to seize only the devices that were used primarily by Perez and that likely contained evidence of his harboring illegal aliens for his business. For example, agents did not seize cell phones, tablets and computers that were identified as being used primarily by Perez' children at their home. Agents seized all of the electronic storage devices found in the Cartersville and Rossville offices because Perez told agents that Aztec Framing business was the only business he conducted in those offices, and he used those devices to do so.

### Conclusion

54. Based on the foregoing, there is probable cause to believe that the electronic devices listed in Attachment A now contain evidence of a crime and contraband, fruits of crime, or items illegally possessed, concerning Perez's alien harboring for commercial advantage, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (iv) & (B)(1); money laundering—that is, conducting financial transactions with the proceeds of his alien harboring—in violation of 18 U.S.C. §§ 1956(a)(1) and 1957(a), and being an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5).

### Electronic Storage and Forensic Analysis

55. Based on my knowledge, training, and experience, I know that electronic devices and electronic storage medium such as the Devices listed in Attachment A can store information for long periods of time. Similarly, things that have been

viewed via the Internet are typically stored for some period of time on internet-capable electronic devices. This information can sometimes be recovered with forensics tools.

56.   There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

  a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c.  Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

     d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

     a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

58. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether the Device contains evidence described by the warrant.

21

59. *Manner of execution.* Because this warrant seeks only permission to examine Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at ally time in the day or night.

**ATTACHMENT A—Things to be Searched**

The property to be searched consists of the following electronic devices and electronic storage medium (the "Devices"), which are currently in the possession of the Resident Agent in Charge Office of the United States Department of Homeland Security located at 920 Abutment Road, Dalton, Georgia:

**The following devices were seized from Perez's house at 404 Folsom Glade Road in Rydal after agents identified Perez as their primary or sole user:**

1. 7 Micro SD Cards

2. 6 SD Cards

3. 2 Sony Memory Stick

4. 6 USB Drive

5. Dell Laptop GJFKQC1

6. Apple MacBook Model A1286

7. Black Tablet

8. Maxtor External Hard Drive, S/N 2HAP02BS

9. Apple iPhone A1661 silver with gold

10. Pink Apple iPhone

11. Pink Apple iPhone  A1524

12. HTC Sprint Cell Phone

13. Silver Apple iPhone A1429

**The following devices were seized from Perez's Aztec Framing office at 1325 Cassville Road in Cartersville:**

14. EverFocus Digital Video Security DVR, S/N 13M026060169

15. HP Desktop computer, S/N 3CR9110P04 `

16. Compaq Laptop computer, S/N 2CE8523JN2

17. Micro SD Card

**The following devices were seized from Perez's Aztec Framing office at 1641**

**Lafayette Road in Rossville:**

18. Apple iPhone 5 A1688

19. Apple iPhone A1429

20. Apple iPhone A1586

21. Samsung Galaxy Note 4 cell phone

22. HTC cell phone, S/N 99HYK012-00

23. Compaq Presario computer, S/N CNK5220DJF

24. HP Laptop computer, S/N 5CD4293LLJ

25. HP Laptop computer, S/N CND6466XLT

26. One thumb drive

## Attachment B—Evidence to be Seized

The items to be seized from within the digital devices listed in Attachment A are evidence of violations of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (iv) & (B)(1); 18 U.S.C. § 922(g)(5); and 18 U.S.C. §§ 1956(a)(1) and 1957(a) specifically:

(1)  Any correspondence pertaining to, or which may relate to knowingly encouraging or inducing an alien to reside in the United States by providing residence and/or employment for the purpose of commercial advantage or financial gain;

(2)  Letters and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, which may relate to knowingly encouraging or inducing an alien to reside in the United States by providing residence and/or employment for the purpose of commercial advantage or financial gain;

(3)  Papers, tickets, notes, schedules, receipts, passports, immigration and identity documents and other documents of employees and/or subcontractors;

(4)  Identification documents, employment records, Employment Eligibility Verification forms (Form I-9), rent payments, bank statements, tax records, employee records, business records and payroll; which may relate to harboring and/or employing aliens;

(5)  Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills; and

25

(6)  Documents, receipts, and/or bill of sale that will reveal the origin of the firearms that were seized.